PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 14-4764

———————————

TRINITY WALL STREET

v.

WAL-MART STORES, INC.,
                              Appellant

———————————

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-14-cv-00405)
District Chief Judge: Honorable Leonard P. Stark

———————————

Argued April 8, 2015

Before: AMBRO, VANASKIE,
and SHWARTZ, <u>Circuit Judges</u>

(Opinion filed: July 6, 2015)

Theodore J. Boutrous, Jr., Esquire   (Argued)
Gibson Dunn
333 South Grand Avenue
Los Angeles, CA   90071

Philip A. Rovern, Esquire
Matthew E. Fisher, Esquire
Angela C. Whitesell, Esquire
Potter, Anderson & Corroon
1313 North Market Street, 6th Floor
Wilmington, DE   19801

Adam H. Offenhartz, Esquire
Aric H. Wu, Esquire
Gibson Dunn
 200 Park Avenue, 47th Floor
New York, NY   10166

            Counsel for Appellant

Christopher M. Foulds, Esquire
Joel E. Friedlander, Esquire   (Argued)
Jeffrey M. Gorris, Esquire
Friedlander & Gorris
222 Delaware Avenue, Suite 1400
Wilmington, DE  19801

            Counsel for Appellee

Robert A. Long, Jr., Esquire
Keir D. Gumbs, Esquire
David B. H. Martin, Esquire
Reid Hooper, Esquire

Ali Mojibi, Esquire
Covington & Burling LLP
850 10th Street, N.W., One City Center
Washington DC 20001

Stacy Linden, Esquire
Peter Tolsdorf, Esquire
American Petroleum Institute
1220 L Street, N.W.
Washington, DC 20005

     Counsel for Amicus Appellants
     American Petroleum Institute, Business Roundtable,
     Chamber of Commerce of the United States of
     America,

Cory Andrews, Esquire
Richard A. Samp, Esquire
Washington Legal Foundation
2009 Massachusetts Avenue, N.W.
Washington, DC 20036

     Counsel for Amicus Appellant
     Washington Legal Foundation

Richard L. Wyatt, Jr., Esquire
Neil K. Gilman, Esquire
Steven M. Haas, Esquire
Scott H. Kimpel, Esquire
J. Steven Patterson, Esquire
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037

Linda Kelly, Esquire
Patrick Forrest, Esquire
National Association of Manufacturers
733 10th Street, N.W., Suite 700
Washington, DC   20001

       Counsel for Amicus Appellant
       National Association of Manufacturers

William B. Chandler, III, Esquire
Bradley D. Sorrels, Esquire
Ian R. Liston, Esquire
Wilson, Sonsini, Goodrich & Rosati, P.C.
222 Delaware Avenue, Suite 800
Wilmington, DE   19801

Gideon A. Schor, Esquire
Wilson, Sonsini, Goodrich & Rosati, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY   10019

Deborah R. White
Retail Litigation Center, Inc.
1700 North Moore Street, Suite 2250
Arlington, VA   22209

       Counsel for Amicus Appellant
       Retail Litigation Center Inc.

Paul J. Lockwood, Esquire
Elisa M.C. Klein, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP

920 North King Street
One Rodney Square, P.O. Box 636
Wilmington, DE 19801

Brian V. Breheny, Esquire
Hagen J. Ganem, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005

Darla C. Stuckey, Esquire
Society of Corporate Secretaries
    and Governance Professionals, Inc.
240 West 35th Street
New York, NY 10001

      Counsel for Amicus Appellant
      Society of Corporate Secretaries and
      Governance Professionals Inc.

Jeffrey W. Golan, Esquire
Lisa M. Port, Esquire
Barrack, Rodos & Bacine
2001 Market Street
3300 Two Commerce Square
Philadelphia, PA 19103

      Counsel for Amicus Appellee
      Robert F. Kennedy Center for Justice & Human Rights

Maureen Barden, Esquire
4220 Spruce Street
Philadelphia, PA 19104

Richard J. Davis, Esquire
415 Madison Avenue, 11th Floor
New York, NY   10017

> Counsel for Amicus Appellees
> Mark Barden, Jacqueline Barden, Ian Hockley,
> Nicole Hockley, Bill Sherlach, Leonard Pozner,
> Veronique Pozner, Gilles Rousseau,
> Law Center to Prevent Gun Violence

Rolin P. Bissell, Esquire
John J. Paschetto, Esquire
Benjamin Potts, Esquire
Young, Conaway, Stargatt & Taylor
1000 North King Street, Rodney Square
Wilmington, DE  19801

> Counsel for Amicus Appellee (Corporate and
> Securities Law Professors): Lynn Stout, Jayne
> Barnard, William A. Birdthistle,   Norman D. Bishara,
> Margaret M. Blair, Douglas M. Branson, James D.
> Cox, Michael B. Dorff, Lisa M. Fairfax, Tamar
> Frankel, Brandon L. Garrett, Kent Greenfield,
> Daniel J.H. Greenwood, Jon Hanson, Thomas Lee
> Hazen, Robert C. Hockett,  Robert J. Jackson, Jr.,
> Lyman Johnson, Renee M. Jones, Thomas W. Joo,
> Donald C. Langevoort, Patricia A. McCoy, Donna M.
> Nagy, Lisa H. Nicholson, Charles R.T. O'Kelley,
> Saule T. Omarova, Stefan J. Padfield, Alan R.
> Palmiter, Frank Partnoy, Brian J.M. Quinn, Margaret
> V. Sachs, Cindy A. Schipani, Jennifer Taub, Kelly Y.
> Testy, Cheryl L. Wade, David H. Webber, Cynthia
> Williams, Adam Winkler.

OPINION OF THE COURT

AMBRO, Circuit Judge

Table of Contents

I.   INTRODUCTION ............................................................. 8
II.  FACTS & PROCEDURAL HISTORY .......................... 10
     A.  Trinity Objects to Wal-Mart's Sale of Assault Rifles. 10
     B.  Trinity's Shareholder Proposal. ................................. 12
     C.  Wal-Mart Seeks a No-Action Letter from the SEC. ... 16
     D.  Trinity Takes its Fight to Federal Court: Round One. 18
     E.  Round Two. ................................................................. 21
III. REGULATORY BACKGROUND ............................... 25
     A.  The Proxy Statement .................................................. 25
     B.  Proxy Solicitation ...................................................... 26
     C.  Shareholder Proposals ............................................... 27
     D.  Exclusion of Shareholder Proposals .......................... 28
     E.  SEC Interpretive Releases on the "Ordinary Business"
         Exclusion ................................................................... 31
         1.  The 1976 Proposing Release ................................ 32
         2.  The 1976 Adopting Release ................................. 32
         3.  The 1982 Proposing Release ................................ 34
         4.  The 1983 Adopting Release ................................. 34
         5.  The 1997 Proposing Release ................................ 35
         6.  The 1998 Adopting Release ................................. 37
IV.  ANALYSIS ...................................................................... 38
     A.  Trinity's Proposal Relates to Wal-Mart's Ordinary
         Business Operations. .................................................. 39
         1.  What is the subject matter of Trinity's proposal? . 39

   2. Does Wal-Mart's approach to whether it sells particular products relate to its ordinary business operations? ........................................... 45

 B. Trinity's Proposal Does Not Focus on a Significant Policy Issue that Transcends Wal-Mart's Day-to-Day Business Operations. ................................... 47

   1. Does Trinity's proposal raise a significant social policy issue? ........................................... 48

   2. Even if Trinity's proposal raises a significant policy issue, does that issue transcend Wal-Mart's ordinary business operations? ............................... 50

V. CONCLUSION ............................................................. 59

## I.    INTRODUCTION

"[T]he secret of successful retailing is to give your customers what they want."   Sam Walton, SAM WALTON: MADE IN AMERICA 173 (1993).   This case involves one shareholder's attempt to affect how Wal-Mart goes about doing that.

Appellant Wal-Mart Stores, Inc., the world's largest retailer, and one of its shareholders, Appellee Trinity Wall Street—an Episcopal parish headquartered in New York City that owns Wal-Mart stock—are locked in a heated dispute.  It stems from Wal-Mart's rejection of Trinity's request to include its shareholder proposal in Wal-Mart's proxy materials for shareholder consideration.

Trinity's proposal, while linked to Wal-Mart's sale of high-capacity firearms (guns that can accept more than ten rounds of ammunition) at about one-third of its 3,000 stores, is nonetheless broad.  It asks Wal-Mart's Board of Directors to develop and implement standards for management to use in

8

deciding whether to sell a product that (1) "especially endangers public safety"; (2) "has the substantial potential to impair the reputation of Wal-Mart"; and/or (3) "would reasonably be considered by many offensive to the family and community values integral to the Company's promotion of its brand." Standing in Trinity's way, among other things, is a rule of the Securities and Exchange Commission ("SEC" or "Commission"), known as the "ordinary business" exclusion. 17 C.F.R. § 240.14a-8(i)(7) ("Rule 14a-8(i)(7)"). As its name suggests, the rule lets a company omit a shareholder proposal from its proxy materials if the proposal relates to its ordinary business operations.

Wal-Mart obtained what is known as a "no-action letter" from the staff of the SEC's Division of Corporate Finance (the "Corp. Fin. staff" or "staff"), thus signaling that there would be no recommendation of an enforcement action against the company if it omitted the proposal from its proxy materials. *See Wal-Mart Stores, Inc.*, SEC No-Action Letter, 2014 WL 409085, at *1 (Mar. 20, 2014). Trinity thereafter filed suit in federal court, seeking to enjoin Wal-Mart's exclusion of the proposal. *See Trinity Wall Street v. Wal-Mart Stores, Inc.*, --- F. Supp. 3d ----, No. 14-405-LPS, 2014 WL 6790928 (D. Del. Nov. 26, 2014). The core of the dispute is whether the proposal was excludable under the ordinary business exclusion. Although the District Court initially denied Trinity's request, it handed the church a victory on the merits some seven months later by holding that, because the proposal concerned the company's Board (rather than its management) and focused principally on governance (rather than how Wal-Mart decides what to sell), it was outside Wal-Mart's ordinary business operations. Wal-Mart appeals, seeking a ruling that it could exclude Trinity's proposal from its 2015 proxy materials and did not err in excluding the proposal from its 2014 proxy materials.

9

Stripped to its essence, Trinity's proposal—although styled as promoting improved governance—goes to the heart of Wal-Mart's business: what it sells on its shelves. For the reasons that follow, we hold that it is excludable under Rule 14a-8(i)(7) and reverse the ruling of the District Court.[1]

## II. FACTS & PROCEDURAL HISTORY

Public companies publish and circulate a proxy statement in advance of their annual shareholders' meeting. The statement "includes information about items or initiatives on which the shareholders are asked to vote[.]" *Apache Corp. v. Chevedden*, 696 F. Supp. 2d 723, 727 (S.D. Tex. 2010) (citation omitted). It can also include shareholder proposals—a device that allows shareholders to ask for a vote on company matters. Predictably, companies don't easily surrender control of their proxy statement and often lean on an SEC rule to justify excluding a given shareholder proposal. But doing so can trigger a protracted legal battle that escalates from an exchange of views before the SEC to a federal lawsuit. This is one such case.

### A. Trinity Objects to Wal-Mart's Sale of Assault Rifles.

Trinity's roots extend back centuries. Its St. Paul's Chapel is the oldest public building in continuous use in New York City and is where George Washington worshipped after his first inauguration. In 1705, the church was the beneficiary of the lower Manhattan farm of Queen Anne of England, instantly making it very wealthy.

---

[1] Because of the time-sensitive nature of this appeal, we were unable to give a full rationale for a ruling on the date we entered judgment in favor of Wal-Mart. This opinion does so.

The story isn't much different today. Trinity continues to be one of the wealthiest religious institutions in the United States, with a balance sheet of over $800 million in assets and real estate valued at approximately $3 billion. *See* Letter from Trinity Wall Street CFO Accompanying Trinity's 2013 Financial Statements (undated), *available at* https://www.trinitywallstreet.org/sites/default/files/miscellaneous/LetterfromtheCFOaccompanyingthe2013FinancialStatements.pdf. Its strong financial footing, according to Trinity, empowers it to "pursue a mission of good works beyond the reach of other religious institutions." Trinity Br. 16. Part of that mission is to reduce violence in society.

Alarmed by the spate of mass murders in America, in particular the shooting at Sandy Hook Elementary School in December 2012, Trinity resolved to use its investment portfolio to address the ease of access to rifles equipped with high-capacity magazines (the weapon of choice of the Sandy Hook shooter and other mass murderers). Its principal focus was Wal-Mart.

During its review of Wal-Mart's merchandising practices, Trinity discovered what it perceived as a major inconsistency. Despite the retailer's stated mission to "make a difference on the big issues that matter to us all," Trinity Br. 11, it continued in some states to sell the Bushmaster AR-15 (a model of assault rifle). Trinity also perceived Wal-Mart as taking an unprincipled approach in deciding which products to sell. For example, despite its position on the AR-15, Wal-Mart does not sell adult-rated movie titles (*i.e.*, those rated NC-17) or similarly rated video or computer games. Nor does it sell to children under 17 "'R' rated movies or 'Mature' rated video games." Trinity Br. 12. Wal-Mart also doesn't sell "music bearing a 'Parental Advisory Label'" because of concerns about the music containing "strong language or depictions of violence, sex, or substance abuse." *Id.* And

11

apparently due to safety concerns, it has stopped selling (1) handguns in the United States; (2) high-capacity magazines separate from a gun; and (3) guns through its website. Trinity Br. 13. Trinity attributes these perceived inconsistencies to the "lack of written policies and Board oversight concerning its approach to products that could have momentous consequences for both society and corporate reputation and brand value[.]" Trinity Br. 16.[2]

**B. Trinity's Shareholder Proposal.**

Trinity pressed Wal-Mart to explain its continued sale of the Bushmaster AR-15. Wal-Mart's response was as follows:

> There are many viewpoints on this topic and many in our country remain engaged in the conversations about the sale and regulation of certain firearms. In areas of the country where we sell firearms, we have a long standing commitment to do so safely and

---

[2] In its brief and again at oral argument, Wal-Mart answered Trinity's characterization of its sales practices and referred us to its "Safe and Compliant Product Policy" and its "Product Safety and Compliance" division, which "administers programs to identify, mitigate, and monitor risks associated with general merchandise." Reply Br. 4. Wal-Mart also noted that a Board Committee is already tasked with "reviewing the Company's reputation with external constituencies and recommending to the Board any proposed changes to the Company's policies, procedures, and programs as a result of such review." *Id.* (citing J.A. 47) (alterations omitted).

12

responsibly. Over the years, we've been very purposeful about finding the right balance between serving hunters and sportsmen and ensuring that we sell firearms responsibly. Wal-Mart's merchandising decisions are based on customer demand and we recognize that most hunters and sportsmen use firearms responsibly and wish to continue to do so . . . .

While there are some like you, Rev. Cooper, who ask us to stop selling firearms, there are many customers who ask us to continue to sell these products in our stores.

J.A. 255–56.

Unmoved, Trinity drafted a shareholder proposal aimed at filling the governance gap it perceived. The proposal, which is the subject of this appeal, provides:

> Resolved:
>
> > Stockholders request that the Board amend the Compensation, Nominating and Governance Committee charter . . . as follows:
> >
> > "27. Providing oversight concerning [and the public reporting of] the formulation and implementation of . . . policies and standards that determine whether or not the Company should sell a product that:

13

> 1) especially endangers public safety and well-being;
>
> 2) has the substantial potential to impair the reputation of the Company; and/or
>
> 3) would reasonably be considered by many offensive to the family and community values integral to the Company's promotion of its brand."

J.A. 268.

The narrative part of the proposal makes clear it is intended to cover Wal-Mart's sale of certain firearms. It provides that the

> oversight and reporting is intended to cover policies and standards that would be applicable to determining whether or not the company should sell guns equipped with magazines holding more than ten rounds of ammunition ("high capacity magazines") and to balancing the benefits of selling such guns against the risks that these sales pose to the public and to the Company's reputation and brand value.

*Id.*

The proposal also included a supporting statement asserting in relevant part that

> [t]he company respects family and community interests by choosing not to sell certain

14

products such as music that depicts violence or sex and high capacity magazines separately from a gun, but lacks policies and standards to ensure transparent and consistent merchandizing decisions across product categories. This results in the company's sale of products, such as guns equipped with high capacity magazines, that facilitate mass killings, even as it prohibits sales of passive products such as music that merely depict such violent rampages.

. . . .

While guns equipped with high capacity magazines are just one example of a product whose sale poses significant risks to the public and to the company's reputation and brand, their sale illustrates a lack of reasonable consistency that this proposal seeks to address through Board level oversight. This responsibility seems appropriate for the Compensation, Nominating and Governance Committee, which is charged with related responsibilities.

J.A. 268–69.[3]

---

[3] In this context, the proposal is similar to that of a shareholder proposal submitted to Wal-Mart in December 2000 to halt its sale of "handguns and their accompanying ammunition, in any way (e.g.[,] by special order)." *Wal-Mart Stores, Inc.*, SEC No-Action Letter, 2001 WL 253625, at *1 (Mar. 9, 2001). Like Trinity, the submitting shareholder maintained that it was "inappropriate for a 'family store' to

15

The purpose of the proposal, as explained by the Reverend James H. Cooper, Trinity's Rector, is to

> allow[] the company to make a transparent choice considering both the business and ethical (community impact) aspects of the matter. Anti-violence concerns can be broadly considered, including for example the sale of video games glorifying violence, as well as other merchandising decisions that are inconsistent with the well-being of the community and/or Wal-Mart's brand value and desired reputation.

Trinity Br. 18–19 (citation omitted).

## C. Wal-Mart Seeks a No-Action Letter from the SEC.[4]

On January 30, 2014, Wal-Mart notified Trinity and the Corp. Fin. staff of its belief that it could exclude the

_____

sell handguns in any way." *Id.* at *4. As here, the Corp. Fin. staff issued a no-action letter allowing Wal-Mart to exclude the proposal from its proxy materials because it related to its "ordinary business operations (i.e., the sale of a particular product)." *Id.* at *6.

[4] In the words of the SEC, a "no-action letter is one in which an authorized staff official indicates that the staff will not recommend any enforcement action to the Commission if the proposed transaction described in the incoming correspondence is consummated." Procedures Utilized by the Division of Corporate Finance for Rendering Informal Advice, Release No. 6,253, 1980 WL 25632, at *1 n.2 (Oct. 28, 1980).

16

proposal from its 2014 proxy materials under Rule 14a-8(i)(7). Trinity predictably disagreed, stating that its proposal didn't "meddl[e] in ordinary course decision-making" but focused on "big picture oversight and supervision that is the responsibility of the Board." J.A. 280. In support of that assertion, Trinity offered three reasons why its proposal was not excludable:

1. [it] addresses corporate governance through Board oversight of important merchandising policies and is substantially removed from particularized decision-making in the ordinary course of business;

2. [it] concerns the Company's standards for avoiding community harm while fostering public safety and corporate ethics and does not relate exclusively to any individual product; and

3. [it] raises substantial issues of public policy, namely a concern for the safety and welfare of the communities served by the Company's stores.

J.A. 280. Trinity also touted the proposal as: not dictating "the specifics of how that Board oversight will operate or how best to report publically on the policies being followed by the Company and their implementation," J.A. 281; not seeking to "determine what products should or should not be sold by the Company," *id.*; allowing policy development "not by shareholders, but by management, using its knowledge and discretion," *id.*; and addressing "the ethical responsibility of the Company to take account of public safety and well-being,

17

and the related risks of damage to the Company's reputation and brand," J.A. 283.

On March 20, 2014, the Commission's Corp. Fin. staff issued a "no-action" letter siding with Wal-Mart. It noted that "there appears to be some basis for [Wal-Mart's] view that [it] may exclude the proposal under rule 14a-8(i)(7), as relating to [its] ordinary business operations[,]" because "[p]roposals concerning the sale of particular products and services are generally excludable under [the rule]." *Wal-Mart Stores, Inc.*, SEC No-Action Letter, 2014 WL 409085, at *1 (Mar. 20, 2014). Consequently, the staff would "not recommend enforcement action to the Commission if Walmart [*sic*] omits the proposal from its proxy materials in reliance on rule 14a-8(i)(7)." *Id.*

Because no-action letters are not binding—they reflect only informal views of the staff and are not decisions on the merits—Trinity's proposal still had life.

### D. Trinity Takes its Fight to Federal Court: Round One.

On April 1, 2014, and just 17 days before Wal-Mart's proxy materials were due at the printer, Trinity filed a declaratory judgment action against Wal-Mart in the District of Delaware. It sought a declaration that "Wal-Mart's decision to omit the proposal from [its] 2014 Proxy Materials violates Section 14(a) of the 1934 Act and Rule 14a-8." *Trinity*, 2014 WL 6790928, at *2 (internal citation omitted). The relief it requested was twofold:

> 1. A permanent injunction to prevent Wal-Mart from excluding its proposal from its 2015 proxy materials; and

18

2. A preliminary injunction to prevent it from printing, issuing, filing, mailing or otherwise transmitting proxy materials in connection with its 2014 Annual Meeting that do not contain the shareholder proposal submitted by Trinity.

*Id.*

Because of the April 17 deadline, the District Court held an emergency hearing on Trinity's preliminary injunction request. At the hearing the Court described Trinity's burden as "heavy," the remedy it was seeking as "extraordinary," and the time frame within which it had to rule as "highly expedited." *Id.* It didn't help Trinity's cause that the SEC had already sided with Wal-Mart.

It's very clear that the SEC has had hundreds of opportunities to consider questions like this. I have not. While the SEC may only have a few hours or whatever to put into each of these, I have roughly the same amount of time. You come to what you know is an extremely busy court. We have given this expedited attention. It comes to us with a no action conclusion from the SEC staff . . . You come to me, you have the burden [of] asking for extraordinary relief, and I need to find that it's likely that at the end of the trial, whenever we get there, I'm going to disagree with the SEC staff.

*Id.* at *3 (brackets omitted).

19

Viewing the proposal as one dealing "with guns on the shelves and not guns in society," the Court, in a ruling from the bench, held that the proposal related to an "ordinary business matter" and was thus excludable under Rule 14a-8(i)(7). *Id.* It explained that

> [t]he proposal [] expressly and . . . importantly states that the requested "oversight and/or reporting is intended to cover policies and standards that would be applicable [to] determining whether or not the company should sell guns equipped with magazines holding more than 10 rounds of ammunitions, high capacity magazines." And I tried to emphasize it's my added emphasis on "sell."
>
> . . . .
>
> While the specific proposal is crafted as one directed solely to policy and oversight and therefore arguably arises in the difficult and seemingly novel perhaps intersection between ordinary business . . . on the [one] hand [and corporate governance] on the other hand, ultimately I'm not persuaded that I'm likely to conclude at the end of the day on the merits that it therefore does not fall within the exception given the rule for ordinary business.

*Id.* (emphases omitted). The Court also gave weight to the SEC's "expertise" and "lengthy experience" involving proxy contests. *Id.*[5]

Although the favorable ruling allowed Wal-Mart to exclude Trinity's proposal from its 2014 proxy materials, it had not yet prevailed on the merits.

### E. Round Two.

Wal-Mart thereafter moved to dismiss both counts of Trinity's amended complaint. It contended that Trinity's challenge to Wal-Mart's exclusion of the proposal from the retailer's 2014 proxy materials (count 1) was moot, *see id.* at *4, and the challenge to Wal-Mart's "*reasonably anticipated* 2015 violation of Section 14(a) and Rule 14a-8" (count 2) wasn't ripe, *id.* at *5 (emphasis added). The District Court granted Wal-Mart's motion only in part. It disagreed on mootness, but agreed on ripeness. Most notably, however, and in direct tension with its earlier decision, the Court on summary judgment held that the proposal was *not* excludable under Rule 14a-8(i)(7).

With more time to deliberate, the Court concluded that, although the proposal "could (and almost certainly would) shape what products are sold by Wal-Mart," it is "best viewed as dealing with matters that are *not* related to Wal-Mart's ordinary business operations." *Id.* at *8 (emphasis added). Thus Rule 14(a)-8 could not block its inclusion in Wal-Mart's proxy materials. The Court fastened its holding

---

[5] To be sure, the Court did not suggest that staff no-action letters get automatic deference; just that "*under the circumstances*, . . . some deference [was] merited." J.A. 110 (emphasis added).

to the view that the proposal wasn't a directive to management but to the Board to "oversee the development and effectuation of a Wal-Mart policy." *Id.* at *9. In this way, "[a]ny direct impact of adoption of Trinity's proposal would be felt at the Board level; it would then be for [it] to determine what, if any, policy should be formulated and implemented." *Id.* Stated differently, the day-to-day responsibility for implementing whatever policies the Board develops was outside the scope of the proposal.

In the alternative, the Court held that even if the proposal does tread on the core of Wal-Mart's business—the products it sells—it "nonetheless 'focuses on sufficiently significant social policy issues'" that "transcend[] the day-to-day business matters" of the company, making the proposal "appropriate for a shareholder vote." *Id.* at *9 (brackets & emphasis omitted). Among the policy issues the District Court noted are "the social and community effects of sales of high capacity firearms at the world's largest retailer and the impact this could have on Wal-Mart's reputation, particularly if such a product sold at Wal-Mart is misused and people are injured or killed as a result." *Id.*

The Court also found helpful how "Trinity [] carefully drafted its proposal . . . to not dictate what products should be sold or how the policies regarding sales of certain types of products should be formulated or implemented." *Id.* at *10. It stressed the difference between Trinity's proposal and the generally excludable proposals that ask a company to report on its "policies and reporting obligations regarding possible toxic and hazardous products offered for sale." *See id.* ("Each of these proposals requested policies or information— such as information on the companies' efforts to minimize exposure to toxic substances, attempts by the companies to secure supply chains, options for alternative safer products, and encouraging suppliers to reduce or eliminate harmful

22

substances—which directly impacted the ordinary business operations of the companies involved far more than Trinity's proposal would directly impact Wal-Mart.").[6]

Finally, the District Court addressed Wal-Mart's secondary argument that Trinity's proposal is excludable under Rule 14a-8(i)(3) for being "so inherently vague or

[6] As to Wal-Mart's reliance on the Corp. Fin. staff's grant of its no-action request, "a factor to which the Court [] accorded significant weight at the preliminary injunction stage," it declined to accord the staff's action any weight because "[i]t is undisputed that the final determination as to the applicability of the ordinary business exception is for the Court alone to make." *Id.* (citation omitted). It also explained the shift from its earlier ruling:

> At that earlier time Trinity was seeking "extraordinary relief" and the Court's analysis was . . . rushed as well as truncated. In fact, a mere ten days passed between the filing of the motion and the oral argument and the Court's ruling on it. Under the tight time constraints, the Court did not even permit full briefing on the preliminary injunction motion. As . . . noted at that time, "one hopes that if the case proceeds, I'll at least have more time to reflect further on the argument." Having now had the benefit of that time for reflection, as well as the invaluable assistance of additional briefing and oral argument, the Court sees the issues in the way it has explained here.

*Id.* at *11.

23

indefinite that neither the stockholders voting on the proposal, nor the company in implementing the proposal (if adopted), would be able to determine with any reasonable certainty exactly what actions or measures the proposal requires." *Id.* at \*11 (quoting SEC Staff Legal Bulletin No. 14B, 2004 WL 3711971, at \*4 (Sept. 15, 2004)). It acknowledged that "Wal-Mart is undoubtedly correct that the 'broad variety of products offered by [it] and the numerous customers, employees and communities around the world with whom [it] works' mean that 'there is no *single* set of 'family and community values' that would be readily identifiable as being 'integral to the company's promotion of its brand.''" *Id.* (emphasis in original, bold omitted). But it doesn't "follow from this that shareholders voting on the proposal, or the Committee in implementing it (if approved), would be unable to determine with reasonable certainty what the Committee needs to do." *Id.* "Instead, it merely illustrates . . . that the [p]roposal properly leaves the details of any policy formulation and implementation to the discretion of the Committee, showing once more that [it] does not dictate any particular outcome or micro-manage Wal-Mart's day-to-day business." *Id.*

Wal-Mart appeals from both of the Court's holdings on the merits.

The District Court had jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. We have jurisdiction under 28 U.S.C. § 1291. Trinity's request to enjoin Wal-Mart from excluding the proposal from its 2015 proxy materials is ripe, as Trinity resubmitted its proposal for inclusion in Wal-Mart's 2015 proxy materials and Wal-Mart again rebuffed its request. We review the District Court's order granting Trinity's motion for summary judgment *de novo*. As it did below, Wal-Mart bears the burden of establishing as a matter of law that it properly excluded the proposal under an

24

exception to Rule 14a-8. *See AFSCME v. Am. Int'l Grp., Inc.*, 462 F.3d 121, 125 (2d Cir. 2006).

## III.   REGULATORY BACKGROUND

### A. The Proxy Statement

A shareholder that is unable to attend a company's annual meeting isn't disenfranchised. It can vote its shares by proxy by empowering an attending shareholder to do so on its behalf. Vote by proxy has "become an indispensable part of corporate governance because the 'realities of modern corporate life have all but gutted the myth that shareholders in large publicly held companies personally attend annual meetings.'" *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 821 F. Supp. 877, 881 (S.D.N.Y. 1993) (brackets omitted) (quoting *Stroud v. Grace*, 606 A.2d 75, 86 (Del. 1992)); *see also* Proposed Amendments to Rule 14a-8, Exchange Act Release No. 19,135, 1982 WL 600869, at *2 (Oct. 14, 1982) ("1982 Proposing Release") (noting that "with the increased dispersion of security holdings in public companies, the proxy solicitation process rather than the shareholder's meeting itself [] [became] the forum for shareholder suffrage").

As discussed above, a public company that solicits proxies must distribute a proxy statement to each of its shareholders in advance of the annual shareholder meeting. The statement is an informational package that tells shareholders "about items or initiatives on which [they] are asked to vote, such as proposed bylaw amendments, compensation or pension plans, or the issuance of new securities." *Apache Corp.*, 696 F. Supp. at 727 (citation omitted). "The proxy card, on which the shareholder may submit its proxy, and the proxy statement together are the 'proxy materials.'" *Id.* (citing 17 C.F.R. § 2401.14a-8(j)).

25

### B. Proxy Solicitation

Through its proxy materials, a company solicits proxies—hence the term "proxy solicitation." Congress, under the Securities Exchange Act of 1934, gave the SEC oversight of the proxy context. *See* 3 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 10.1[1] (6th ed. 2009) (describing the 1934 Act as a congressional response to the uptick of "great corporate frauds [that] had been perpetrated through management solicitation of proxies that did not indicate to the shareholders the nature of any matters to be voted upon"). "Section [] 14(a) of the [1934 Act] renders unlawful the solicitation of proxies in violation of the SEC's rules and regulations, which are codified at 17 C.F.R. § 240.14a-1 *et seq*." *Amalgamated Clothing & Textile Workers Union*, 821 F. Supp. at 881; *see also J.I. Case v. Borak Co.*, 377 U.S. 426, 431 (1964) ("The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.").

The SEC's "proxy rules are concerned with assuring full disclosure to investors of matters likely to be considered at shareholder meetings." Hazen at § 10.2[1]. To that end, the SEC adopted "Rule 14a-9, which prohibits 'false or misleading' statements made in any proxy statement, form of proxy, notice of meeting or other communication." *Amalgamated Clothing & Textile Workers Union*, 821 F. Supp. at 882 (citing 17 C.F.R. § 240.14a-9(a)). It has interpreted the rule to "require companies to provide shareholders with the opportunity to submit proposals to management for inclusion in the corporation's proxy materials." *Id.*

To complement Rule 14a-9, the Commission promulgated Rule 14a-8 "to catalyze what many hoped would

be a functional 'corporate democracy.'"  Alan R. Palmiter, *The Shareholder Proposal Rule: A Failed Experiment in Merit Regulation*, 45 Ala. L. Rev. 879, 879 (1994).  The rule mandates subsidized shareholder access to a company's proxy materials, requiring "reporting companies . . . to print and mail with management's proxy statement, and to place on management's proxy ballot, any 'proper' proposal submitted by a qualifying shareholder."  *Id.* at 886; *cf. Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 421 (D.C. Cir. 1992) (R.B. Ginsburg, J.) (maintaining that Rule 14a-8's "right to be informed" is complementary to but distinct from Rule 14a-9's "ban on misleading statements in proxy solicitations").  The idea was to provide shareholders a way to "bring before their fellow stockholders matters of [shareholder concern]" that are "proper subjects for stockholders' action under the laws of the state under which [the Company] was organized," 1982 Proposing Release, 1982 WL 600869, at \*3, and to "have proxies with respect to such proposals solicited at little or no expense to the security holder," *id.* at \*2.

## C. Shareholder Proposals

A primary means to urge corporate reform is the shareholder proposal, which "communicate[s] not only [shareholders'] interest[] in a company's financial performance, but also their interests and preferences concerning a wide range of issues, such as the board's structure and oversight of important policies, sustainability, and ethical performance."  Brief of *amici curiae* Corporate and Securities Law Professors 2.  The hard part, however, is soliciting votes to pass a proposal—especially where the motivation is to raise awareness of a policy issue.  *See* James R. Copeland, *Getting the Politics Out of Proxy Season*, Wall St. J., A11 (Apr. 23, 2015) ("Not one of the 1,150 shareholder proposals concerning social or policy issues since 2006 got

27

the support of a majority of voting shareholders over board opposition.").

A shareholder can garner support in one of two ways. It can "pay to issue a separate proxy statement, which must satisfy all the disclosure requirements applicable to management's proxy statement." *Apache Corp.*, 696 F. Supp. 2d at 727 (citation omitted). Or the shareholder can go the Rule 14a-8 route and have the company include its proposal (and a supporting statement) in the proxy materials at the company's expense. *See id.* at 728.

**D. Exclusion of Shareholder Proposals**

Though the Rule 14a-8 option is financially advantageous, it does not "create an open forum for shareholder communication." Palmiter at 886. Rule 14a-8 restricts the company-subsidy to "shareholders who offer 'proper' proposals." *Id.* at 879; *see also* 17 C.F.R. § 240.14a-8 ("This section addresses when a company must include a shareholder's proposal in its proxy statement and identify the proposal in its form of proxy when the company holds an annual or special meeting of shareholders."). A "proper" proposal is one that doesn't fit within one of Rule 14a-8's exclusionary grounds—which are both substantive and procedural.

The procedural exclusions of the rule "protect the solicitation process without regard to a proposal's content[.]" Palmiter at 886. For example, the proponent "must have continuously held at least $2,000 in market value, or 1%, of the company's securities entitled to be voted on the proposal at the meeting for at least one year by the date [it] submit[s] the proposal." 17 C.F.R. § 240.14a-8(b)(1). It can "submit no more than one proposal to a company for a particular shareholders' meeting." *Id.* at § 240.14a-8(b)(2)(i). And the

28

"proposal, including any accompanying supporting statement, may not exceed 500 words." *Id.* at § 240.14a-8(d).

The rule's substantive exclusions, by contrast, are "the most frequently used (and most litigated)." Palmiter at 890. They include (1) the "proper subjects" exclusion, which exists "[i]f the proposal is not a proper subject for action by shareholders under the law of the jurisdiction of the company's organization," 17 C.F.R. § 240.14a-8(i)(1); (2) the "false or misleading" exclusion, which allows companies to bar proposals that are too vague, *id.* at § 240.14a-8(i)(3); (3) the "substantially related" exclusion, which says that a proposal is excludable if it "relates to operations which account for less than 5 percent of the company's total assets [and net earnings and gross sales] at the end of its most recent fiscal year . . . , and is not otherwise significantly related to the company's business," *id.* at § 240.14a-8(i)(5); and, most relevant for purposes of this opinion, (4) the "ordinary business" exclusion, which disallows a proposal that "deals with a matter relating to the company's ordinary business operations," *id.* at § 240.14a-8(i)(7). *See* Palmiter 890.

If a company wants to invoke one of these grounds to exclude a proposal, the process is as follows. First, it must notify the shareholder in writing of the problem with the proposal within 14 days of receiving it and inform the shareholder that it has 14 days to respond. *Id.* at § 240.14a-8(f)(1). If the company finds the shareholder's response unpersuasive and still wants to exclude the proposal, it then must file with the Corp. Fin. staff the reasons why it believes the proposal is excludable no later than 80 days before the company files its proxy materials with the SEC. *Id.* at § 240.14a-8(j)(1). In this letter, the company may also ask the staff for a no-action letter to support the exclusion of a proposal. *See* Donna M. Nagy, *Judicial Reliance on Regulatory Interpretation in S.E.C. No-Action Letters:*

29

*Current Problems and a Proposed Framework*, 83 Cornell L. Rev. 921, 939 (1998) ("Although Rule 14a-8 merely prescribes notification and filing requirements, virtually all companies that decide to omit a shareholder proposal seek a no-action letter in support of their decision."). If the shareholder wants to respond, it can file a submission noting why exclusion would be improper. 17 C.F.R. § 240.14a-8(k).

The staff will respond in one of two ways: (1) with a no-action letter, specifying that the company may omit the shareholder proposal under the exclusion(s) it relied on; or (2) that it is "unable to concur" with the company.[7] A shareholder dissatisfied with the staff's response can, as Trinity did here, pursue its rights against the company in federal court.[8]

---

[7] "[B]efore the SEC staff makes a decision on Rule 14a-8 no-action requests, there are at least three levels of attorney review by a 'task force' dedicated to reviewing Rule 14a-8 no-action requests[.]" *See* Wal-Mart Br. 37–38 (outlining layers of review); *see also Apache Corp. v. New York City Emps.' Ret. Sys.*, 621 F. Supp. 2d 444, 448 n.3 (S.D. Tex. 2008) (describing no-action review process) (citing Thomas P. Lenke, *The SEC No-Action Letter Process*, 42 Bus. Law. 1019, 1027–28 (1987)).

[8] Although rare, the Commission itself may choose to review a no-action letter. Even then, its determination would become a final order only if it "impose[d] an obligation, den[ied] a right or fix[ed] some legal relationship as a consummation of the administrative process." *Amalgamated Clothing & Textile Workers Union v. S.E.C.*, 15 F.3d 254, 257 (2d Cir. 1994) (citations & internal quotation marks omitted); *see also*

## E. SEC Interpretive Releases on the "Ordinary Business" Exclusion

The ordinary business exclusion has been called the "most perplexing" of all the 14a-8 bars. *See* Daniel E. Lazaroff, *Promoting Corporate Democracy and Social Responsibility: The Need to Reform the Federal Proxy Rules on Shareholder Proposals*, 50 Rutgers L. Rev. 33, 94 (1997). This stems from the opaque term "ordinary business," which is neither self-defining nor consistent in its meaning across different corporate contexts. Neither the courts nor Congress have offered a corrective. Rather, and "[f]rom the beginning, Rule 14a-8 jurisprudence—both in quality and quantity—has rested almost exclusively with the [SEC] . . . ." Palmiter at 880. In both its role as umpire and rule-maker, the SEC has provided various iterations of formal interpretive guidance.[9] Because they inform our analysis, we discuss each in turn.

---

Hazen, *supra* at §10.8[1][A][2] (noting that Commission review is appropriate only where it involves "matters of substantial importance and where the issues are novel or highly complex").

[9] Each of the SEC's interpretive releases was adopted after notice and comment and thus merits our deference. As the Supreme Court has explained, "[j]ust as we defer to an agency's reasonable interpretation of the statute when it issues regulations in the first instance, . . . the agency is entitled to further deference when it adopts a reasonable interpretation of the regulations it has put in force." *Fed. Express v. Holowecki*, 552 U.S. 389, 397 (2008); *see also Dep't of Labor v. E. Associated Coal Corp*., 54 F.3d 141, 147 (3d Cir. 1995) ("We accord greater deference to an

1.  The 1976 Proposing Release

The Commission's initial frustration with the ordinary business exclusion was management's reliance on it to omit proposals "that involve matters of considerable importance to the issuer [*i.e.*, the company] and its security holders." Proposed Amendments to Rule 14a-8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders, Release No. 9,343, 1976 WL 160410, at *7 (July 7, 1976) ("1976 Proposing Release"). It proposed two modifications to address this concern. The first was a textual alteration to clarify that a proposal is excludable "only if it deals with a 'routine, day-to-day matter relating to the conduct of the ordinary business operations of the issuer.'" *Id.* at *8. (The rule's then-extant language provided that a proposal was excludable if it consisted of a "recommendation or request that [] management take action on a matter relating to the conduct of the ordinary business operations of the issuer." *Id.* at *7 (internal quotation marks omitted).) The second was a new standard to distinguish "routine" (excludable) from "important" matters (not excludable). *See id.* at *8. In the SEC's view, management teams generally handle "mundane matters" while boards of directors are responsible for high level decision-making. It thus proposed the following standard: "Will it be necessary for the board of directors . . . to act on the matter involved in the proposal?" *Id.* If the answer was no, the proposal dealt with a routine business matter and was thus excludable. *See id.*

2.  The 1976 Adopting Release

Commenters attacked the textual modification and new standard as unworkable. As to the new language, the

administrative agency's interpretation of its own regulations than to its interpretation of a statute.") (citations omitted).

criticism was that many routine, day-to-day business matters "would necessarily deal with ordinary business matters of a complex nature that shareholders, as a group, would not be qualified to make an informed judgment on, due to their lack of business expertise and their lack of intimate knowledge of the issuer's business." Adoption of Amendments Relating to Proposals by Security Holders, Release No. 12, 999, 1976 WL 160347, at *10 (Nov. 22, 1976) ("1976 Adopting Release"). It also "would be difficult to administer because of the subjective judgments that necessarily would be required in interpreting it." *Id.* Regarding the new standard, the Commission relented to the criticism that "board practices relating to the delegation of authority to management personnel vary greatly, and there would, therefore, be no consistency in applying such a standard." *Id.* at *11; *see also id.* ("The potential lack of consistency of the proposed standard is a fatal drawback, in the Commission's view. And, since no other reasonable standard for making the requisite distinctions is readily apparent, the Commission believes that the provision would be difficult, if not impossible, to administer on a satisfactory basis."). It thus opted for a tweak of the text of the exclusion and offered fresh interpretive guidance.

For the former, it deleted any reference to management; the exclusion thus read, much like it does now, that a proposal is excludable if it "deals with a matter relating to the conduct of the ordinary business operations of the issuer." *Id.* Regarding the new guidance, the SEC maintained that the exclusion should be "interpreted somewhat more flexibly than in the past" and reaffirmed that the term "ordinary business operations" has been wrongly interpreted to "include certain matters which have significant policy, economic or other implications inherent in them. For instance, a proposal that a utility company not construct a nuclear power plant has in the past been [wrongly]

33

considered" to be excludable. *Id.* Therefore, "proposals of that nature, as well as others that have major implications, will in the future be considered beyond the realm of an issuer's ordinary business operations." *Id.*

### 3. The 1982 Proposing Release

The SEC took a fresh look at the ordinary business exclusion in 1982 in reviewing the staff's then-prevailing view on proposals that ask a company to (1) prepare a report to shareholders or (2) recommend that a special committee be formed to examine a particular area of its business. *See* 1982 Proposing Release, 1982 WL 600869, at *17. The staff asserted that, as a category, such proposals were not excludable even if the subject matter of the report or examination involved an ordinary business matter because, in its view, a company doesn't disseminate reports to shareholders or establish special committees as part of its ordinary business operations. *See id.*

The SEC agreed to address the objection launched by commenters that the staff's "interpretation [] rais[es] form over substance." *Id.* It thus proposed for consideration "whether it would be more appropriate to consider in each instance whether the type of information sought by the proposal involves the ordinary business operations of the issuer and to disregard whether a proposal requests the preparation and distribution of a report or the formation of a special committee." *Id.*

### 4. The 1983 Adopting Release

After notice and comment, the Commission formalized its adoption of the proposed "significant change in the staff's interpretation" of the exclusion. Amendments to Rule 14a-8 Under the Securities Exchange Act of 1934 Relating to

Proposals by Security Holders, Release No. 20,091, 1983 WL 33272, at *7 (Aug. 16, 1983) ("1983 Adopting Release") ("Because [the staff's] interpretation raises form over substance and renders the provisions of [the ordinary business exclusion] largely a nullity, the Commission has determined to adopt the interpretive change set forth in the Proposing Release."). It thus directed the staff to "consider whether the subject matter of a special report or the committee involves a matter of ordinary business; where it does, the proposal will be excludable." *Id.*

5. The 1997 Proposing Release

The SEC revisited the ordinary business exclusion in the late 1990s to tackle proposals "relating simultaneously to both an 'ordinary business' matter and a significant social policy issue." Amendments to Rules on Shareholder Proposals, Release No. 39,093, 1997 WL 578696, at *12 (Sept. 18, 1997) (the "1997 Proposing Release"). The interpretive snag was that the "fairly straightforward mission" of the rule was ill-suited to address contemporary social issues and "provided no guidance" on how to treat proposals raising such issues. *Id.* This difficulty showed itself when the staff allowed a company (Cracker Barrel Old Country Stores) to exclude a proposal that asked it to "prohibit discrimination on the basis of sexual orientation." *New York City Emps.' Ret. Sys. v. S.E.C.*, 45 F.3d 7, 9 (2d Cir. 1995). In handling the proposal, the staff espoused the view, which the Commissioners of the SEC deemed untenable, that employment-related proposals—regardless whether they raise a social issue—are categorically excludable. *See Cracker Barrel Old Country Store, Inc.*, SEC No-Action Letter, 1992 WL 289095, at *1 (Oct. 13, 1992) ("[T]he Division has determined that the fact that a shareholder proposal concerning a company's employment policies and practices for the general workforce is tied to a social issue will no

35

longer be viewed as removing the proposal from the realm of ordinary business operations of the registrant. Rather, determinations with respect to any such proposals are governed by the employment-based nature of the proposal."). To end this practice, the SEC declared that "employment-related proposals focusing on significant social policy issues could not automatically be excluded under the 'ordinary business' exclusion." 1997 Proposing Release, 1997 WL 578686, at \*13. And going forward, "the 'bright line' approach for employment-related proposals established by the Cracker Barrel position would be replaced by a case-by-case analysis that prevailed previously." *Id.*

In a final note of guidance, the Commission summarized the two considerations that guide how to apply the ordinary business exclusion. "The first relates to the subject matter of the proposal. Certain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight." *Id.* at \*14. According to the SEC, examples of this "include the management of the workforce, such as the hiring, promotion, and termination of employees, decisions on production quality and quantity, and the retention of suppliers." *Id.* Yet "proposals relating to such matters but focusing on significant social policy issues generally would not be considered to be excludable, because such issues typically fall outside the scope of management's prerogative." *Id.* "The second consideration relates to the degree to which the proposal seeks to 'micro manage' the company by probing too deeply into 'matters of a complex nature that shareholders, as a group, would not be qualified to make an informed judgment on, due to their lack of business expertise and lack of intimate knowledge of the (company's) business.'" *Id.* It comes into play where "the proposal seeks intricate detail, or seeks to

36

impose specific time-frames or methods for implementing complex policies." *Id.*

### 6. The 1998 Adopting Release

Yet again the SEC declined to modify the language of the rule, perhaps afraid to unleash unintended consequences. Although "the legal term-of-art 'ordinary business' might be confusing to some shareholders and companies," it posited, the risk that practitioners "might misconstrue [a] revision[] as signaling an interpretive change" was too great to ignore. Amendments to Rules on Shareholder Proposals, Release No. 23, 200, 1998 WL 254809, at *2 (May 21, 1998) ("1998 Adopting Release"); *see also id.* ("Indeed, since the meaning of the phrase 'ordinary business' has been developed by the courts over the years through costly litigation and essentially has become a term-of-art in the proxy area, we recognize the possibility that the adoption of a new term could inject needless costs and other inefficiencies into the shareholder proposal process."). It elected simply to reverse the staff's 1992 *Cracker Barrel* no-action letter, thus "return[ing] to a case-by-case analytical approach," *id.* at *4, and commented that

> [w]hile we acknowledge that there is no bright-line test to determine when employment-related shareholder proposals raising social issues fall within the scope of the "ordinary business" exclusion, the staff will make reasoned distinctions in deciding whether to furnish "no-action" relief. Although a few of the distinctions made in those cases may be somewhat tenuous, we believe that on the whole the benefit to shareholders and companies in providing guidance and informal resolutions will

37

> outweigh the problematic aspects of the few
> decisions in the middle ground.

*Id.* It also reaffirmed that the term "ordinary business" continues to "refer[] to matters *that are not necessarily 'ordinary' in the common meaning of the word*" and "is rooted in the corporate law concept providing management with flexibility in directing certain core matters involving the company's business and operations." *Id.* at *2 (emphasis added).

With that background, we move to the merits of Wal-Mart's appeal.

## IV. ANALYSIS

The principal issue we address is whether Trinity's proposal was excludable because it related to Wal-Mart's ordinary business operations. In doing so, we evaluate the District Court's primary and alternative holdings. To repeat, it held that Trinity's proposal doesn't meddle in the nuts-and-bolts of Wal-Mart's business because it was a directive to the Board (rather than management) to set standards to guide certain merchandising decisions. And in the alternative the proposal is not excludable because it implicates a significant social policy—the sale of high-capacity firearms by the world's largest retailer —that transcends Wal-Mart's ordinary business. In this case (and we agree with the Commission that our determination counsels a case-by-case inquiry) we conclude that the proposal is excludable under the ordinary business proviso and that the significant social policy

intended by the proposal is here no exception to that exclusion.[10]

## A. Trinity's Proposal Relates to Wal-Mart's Ordinary Business Operations.

We employ a two-part analysis to determine whether Trinity's proposal "deals with a matter relating to the company's ordinary business operations[.]" 17 C.F.R. § 240.14a-8(i)(7). Under the first step, we discern the "subject matter" of the proposal. *See* 1983 Adopting Release, 1983 WL 33272, at *7. Under the second, we ask whether that subject matter relates to Wal-Mart's ordinary business operations. *Id.* If the answer to the second question is yes, Wal-Mart must still convince us that Trinity's proposal does not raise a significant policy issue that transcends the nuts and bolts of the retailer's business.

1. What is the subject matter of Trinity's proposal?

Beginning with the first step, we are mindful of the Commission's consistent nod to substance over form and its distaste for clever drafting. As it reaffirmed in the 1982 and 1983 Releases, it matters little how a shareholder styles its proposal; the emphasis should always be on its substance. To

---

[10] A majority of the members of this panel (Judges Shwartz and Vanaskie) also hold that the proposal (which Trinity declined to divide into separate parts) is excludable for being unduly vague under Rule 14a-8(i)(3). I decline to join that holding. Wal-Mart's vagueness objection was first raised in the District Court and not before the SEC in seeking a no-action letter. And before us it devoted little attention to the argument. I thus think it not prudent to reach the vagueness question in this instance.

illustrate its point, the SEC invoked the staff's disparate treatment of two proposals where the Commission thought the outcome should have been the same:

> [T]he staff, in a letter to Castle & Cooke . . . *agreed* with the company that a proposal requesting that it alter its food production methods in underdeveloped countries could be excluded under [the ordinary business exclusion] since [it] specified the steps management should take to implement the action requested . . . . [Years later], however, the proponent instead asked the company *to appoint a committee to review* foreign agricultural operations with emphasis on the balance between labor and capital intensive production. The staff *refused* to apply the rule to this provision because the appointment of a special committee to study the company's foreign agricultural operations is a matter of policy.

1982 Proposing Release, 1982 WL 600869, at *17 n.49 (emphases added). In the SEC's view, a directive to Castle & Cooke to alter its food production methods in underdeveloped countries was the functional equivalent of a request for committee review of those methods. *See id.* Because the staff concurred that the former was excludable, it should have reached the same result as to the latter. Thus, even though Trinity's proposal asks for the development of a specific merchandising policy—and not a review, report or examination—we still ask whether the *subject matter* of the action it calls for is a matter of ordinary business.

Applying that principle, we part ways with the District Court. We perceive it put undue weight on the distinction

40

between a directive to management and a request for Board action. In the District Court's view, if the proposal had directed management to arrange its product assortment in a certain way, it would have been excludable. But because it merely asked the "***Board*** [to] oversee the development and effectuation of a Wal-Mart policy," it was not. *Trinity*, 2014 WL 6790928, at \*9 (emphasis and bold in original); *see also id.* ("Any direct impact of adoption of Trinity's proposal would be felt at the Board level; it would then be for the Board to determine what, if any, policy should be formulated and implemented."). The concern with this line of reasoning is that the SEC in its 1976 Adopting Release rejected the proposed bright line whereby shareholder proposals involving "matters that would be handled by management personnel without referral to the board . . . generally would be excludable," but those involving "matters that would require action by the board would not be." 1976 Proposing Release, 1976 WL 160410, at \*8. Thus, though the District Court's rationale and holding are not implausible, we do not adopt them.

Distancing itself from the District Court's formal approach, Trinity argues that the subject matter of its proposal is the improvement of "corporate governance over strategic matters of community responsibility, reputation for good corporate citizenship, and brand reputation, none of which can be considered ordinary business," Trinity Br. 39, and the focus is on the "shortcomings in Wal-Mart's corporate governance and oversight over policy matters," *id.* at 33. We cannot agree. As the National Association of Manufacturers points out, Trinity's contention, like the District Court's analysis, relies "on how [the proposal] is framed and to whom, rather than [its] substance." Brief of *amicus curiae* Nat'l Assoc. of Mfrs. 15. Contrary to what Trinity would have us believe, the immediate consequence of the adoption of a proposal—here the improvement of corporate

governance through the formulation and implementation of a merchandising policy—is not its subject matter. If it were, then, analogizing to the review context, the subject matter of a review would be the review itself rather than the information sought by it. *See* 1982 Proposing Release, 1982 WL 600869, at *17. For example, under Trinity's position, the subject matter of a proposal that calls for a report on how a restaurant chain's menu promotes sound dietary habits would be corporate governance as opposed to important matters involving the promotion of public health. Yet that is the analysis the SEC disavowed in adopting the suggestions made in the 1982 Proposing Release. The subject matter of the proposal is instead its *ultimate* consequence—here a potential change in the way Wal-Mart decides which products to sell. Indeed, as even the District Court acknowledged, if the company were to adopt Trinity's proposal, then, whatever the nature of the forthcoming policy, it "could (and almost certainly would) shape what products are sold by Wal-Mart[.]" *Trinity*, 2014 WL 6790928, at *9.

This view of the subject matter of Trinity's proposal finds support in a well-established line of SEC no-action letters.[11] The most instructive is the no-action letter issued to

---

[11] Wal-Mart argues that although no-actions letters are generally not entitled to deference, the staff's no-action letter here *is* because it is "consistent with both the SEC's guidance on Rule 14a-8(i)(7) and the SEC staff's prior no-action letters." Reply Br.13. Although we disagree with the view that the letter holds any persuasive value, we do give the staff's body of no-action letters "careful consideration as 'representing the views of persons who are continuously working with the provisions of the statute [the regulation in our case] involved." *Donaghue v. Accenture Ltd.*, No. 03-8329, 2004 WL 1823448, at *3 (S.D.N.Y. Aug. 16, 2004)

Sempra Energy in January 2012. The proposal there urged the Board "to conduct an independent oversight review each year of the Company's management of political, legal, and financial risks posed by [its] operations in any country that may pose an elevated risk of corrupt practices." *Sempra Energy*, SEC No-Action Letter, 2011 WL 6425347, at *2 (Jan. 12, 2012). As Trinity does here, the proposing shareholder framed the subject matter of its proposal as targeting the company's governance of a certain type of risk: "the political, legal, and financial risks" inherent in the company's operations in countries "posing an elevated risk of corrupt practices," *id.*, which could ultimately trigger a Foreign Corrupt Practices Act prosecution. *Cf.* Trinity Br. 40 (maintaining that its proposal addresses the governance of the "risks to society and Wal-Mart should a product, after it is sold, cause harm to [its] customers or its brand and reputation") (quotation marks omitted). But, as here, the staff granted no-action relief because, "although the proposal requests the board to conduct an independent oversight review of Sempra's management of particular risks, the underlying subject matter of these risks appears to involve ordinary business matters." *Sempra Energy*, 2011 WL 6425347, at *1; *see also The Home Depot, Inc.*, SEC No-Action Letter, 2008 WL 257307, at *1, *2 (Jan. 25, 2008) (granting no-action relief where the proposal asked Home Depot's Board to publish a report outlining the company's product safety policies and describing what management is

_____

(brackets, citation & quotation marks omitted); *see also* Nagy *supra* at 1002 (maintaining that whether "the staff has consistently maintained a particular regulatory interpretation in no-action letters over a long period of time is relevant" to whether the interpretation should merit some deference, as "consistent, longstanding staff positions may signal Commission approval of these positions").

doing to address recent product safety concerns because it related to "Home Depot's ordinary business operations (i.e., the sale of particular products)"); *Family Dollar Stores, Inc.*, SEC No-Action Letter, 2007 WL 3317923, at \*1 (Nov. 6, 2007) (same where proposal asked for a report "evaluating Company policies and procedures for systematically minimizing customers' exposure to toxic substances and hazardous components in its marketed products" because it relates to Family Dollar's "ordinary business operations (i.e., sale of particular products)"); *Walgreen Co.*, SEC No-Action Letter, 2006 WL 5381376, at \*1 (Oct. 13, 2006) (same for proposal asking for a report "characterizing the extent to which the company's private label cosmetics and personal care products lines contain carcinogens, mutagens, reproductive toxicants, and chemicals that affect the endocrine system and describing options for using safer alternatives," because the subject matter of the proposal related to Walgreen's "ordinary business operations (i.e., the sale of particular products)").[12]

The staff's consistent focus on the underlying subject matter of a proposal is instructive. So too is Trinity's failure to cite any authority for its view of the subject matter of its proposal. *See* Trinity Br. 37–42. For us, the subject matter of Trinity's proposal is how Wal-Mart approaches

---

[12] In keeping with its emphasis on the subject matter of a proposal, the staff often denies no-action relief where the proposal merely calls for the Board to establish a committee to oversee risk generally. *See, e.g.*, *PepsiCo, Inc.*, SEC No-Action Letter, 2012 WL 542708, at \*1 (Feb. 16, 2012) (denying no-action relief where the proposal merely asked the company to establish "a Risk Oversight Committee of the Board of Directors").

merchandising decisions involving products that (1) especially endanger public-safety and well-being, (2) have the potential to impair the reputation of the Company, and/or (3) would reasonably be considered by many offensive to the family and community values integral to the company's promotion of the brand. A contrary holding—that the proposal's subject matter is "improved corporate governance"—would allow drafters to evade Rule 14a-8(i)(7)'s reach by styling their proposals as requesting board oversight or review. *See* Reply Br. 10. We decline to go in that direction.

2. Does Wal-Mart's approach to whether it sells particular products relate to its ordinary business operations?

Reaching the second step of the analysis, we ask whether the subject matter of Trinity's proposal relates to day-to-day matters of Wal-Mart's business. Wal-Mart says the answer is yes because, even though the proposal doesn't demand any specific changes to the make-up of its product offerings—a point on which Trinity hangs its hat, *see* Trinity Br. 38 ("[The proposal] is not a 'stop selling' proposal. Nor does it require intricate reports on Wal-Mart's products.")—it "seeks to have a [B]oard committee address policies that could (and almost certainly would) shape what products are sold by Wal-Mart." Reply Br. 9 (internal quotation marks omitted). That is, Trinity's proposal is just a sidestep from "a shareholder referendum on how [Wal-Mart] selects its inventory." Brief of *amicus curiae* the Nat'l Assoc. of Mfrs. at 11. And thus its subject matter strikes at the core of Wal-Mart's business.

We agree. A retailer's approach to its product offerings is the bread and butter of its business. As *amicus* the National Association of Manufacturers notes, "Product

selection is a complicated task influenced by economic trends, data analytics, demographics, customer preferences, supply chain flexibility, shipping costs and lead-times, and a host of other factors best left to companies' management and boards of directors." *Id.* at 12; *see also* Brief of *amicus curiae* Retail Litig. Ctr., Inc. 11 ("The understanding of consumer behavior and careful tailoring of product mix is central to the success or failure of a given retailer."). Though a retailer's merchandising approach is not beyond shareholder comprehension, the particulars of that approach involve operational judgments that are ordinary-course matters.

Moreover, that the proposal doesn't direct management to stop selling a particular product or prescribe a matrix to follow is, we think, a straw man. *See* Trinity Br. 38; *Trinity*, 2014 WL 6790928, at *10 ("Trinity has carefully drafted its Proposal. . . . not [to] dictate which products should be sold or how the policies regarding sales of certain types of products should be formulated or implemented."). A proposal need only *relate* to a company's ordinary business to be excludable. *Cf.* 17 C.F.R. § 240.14a-8(i)(7) (exclusion is proper where a proposal deals with a matter "*relating* to the company's ordinary business operations") (emphasis added). It need not dictate any particular outcome. To make the point even clearer, suppose that Trinity's proposal had merely asked Wal-Mart's Board to *reconsider* whether to continue selling a given product. Though the request doesn't dictate a particular outcome, we have no doubt it would be excludable under the SEC's 1983 Adopting Release, as the action sought relates to Wal-Mart's ordinary business operations. This is so even though it doesn't suggest any changes. The same is true here. In short, so long as the subject matter of the proposal *relates*—that is, bears on—a company's ordinary business operations, the proposal is excludable unless some other exception to the exclusion applies.

46

Failing all of this, Trinity retreats to friendlier territory. It contends that, even if the subject matter of its proposal concerns Wal-Mart's ordinary business operations, it focuses on a significant and transcendent social policy issue: Wal-Mart's approach to the risk that the sale of a product can cause "harm to [its] customers or its brand and reputation." Trinity Br. 40; *see also id.* at 44 ("There are various products especially dangerous to reputation, brand value, or the community that a family retailer such as Wal-Mart should carefully consider whether or not to sell, and the proposal addresses the transcendent policy issue of under what policies and standards and with what Board oversight Wal-Mart handles these merchandising decisions."). We address that issue next.

## B. Trinity's Proposal Does Not Focus on a Significant Policy Issue that Transcends Wal-Mart's Day-to-Day Business Operations.

As discussed above, there is a significant social policy exception to the default rule of excludability for proposals that relate to a company's ordinary business operations. For the SEC staff this means that when "a proposal's underlying subject matter transcends the day-to-day business matters of the company and raises policy issues so significant that it would be appropriate for a shareholder vote, the proposal generally will not be excludable under Rule 14a-8(i)(7)." SEC Staff Legal Bulletin No. 14E, 2009 WL 4363205, at *2 (Oct. 27, 2009).

The difficulty in this case is divining the line between proposals that focus on sufficiently significant social policy issues that transcend a company's ordinary business (not excludable) from those that don't (excludable). Even the Commission admits that the social-policy exception "raise[s] difficult interpretive questions." 1997 Proposing Release,

47

1997 WL 578696, at *13. No doubt that is because the calculus is complex. Yet we cannot sidestep what some may deem an unreckonable area. Thus we wade in.

We think the inquiry is again best split into two steps. The first is whether the proposal focuses on a significant policy (be it social or, as noted below, corporate). If it doesn't, the proposal fails to fit within the social-policy exception to Rule 14a-8(i)(7)'s exclusion. If it does, we reach the second step and ask whether the significant policy issue transcends the company's ordinary business operations.

### 1. Does Trinity's proposal raise a significant social policy issue?

We first turn to whether Trinity's proposal focuses on a "sufficiently significant" policy issue like "significant [employment] discrimination." 1998 Adopting Release, 1998 WL 254809, at *4. The District Court said yes because the proposal at its core dealt with "the social and community effects of sales of high capacity firearms at the world's largest retailer." *Trinity*, 2014 WL 6790928, at *9. However, even Trinity concedes its proposal "is not directed solely to Wal-Mart's sale of guns." Trinity Mot. for Summ. J. 17 (ECF No. 38, filed Jun. 18, 2014). Rather it asks Wal-Mart's Board to oversee merchandising decisions for *all* "products especially dangerous to reputation, brand value, or the community that a family retailer such as Wal-Mart should carefully consider whether or not to sell." Trinity Br. 44. *See also* Brief of *amici curiae* Corporate and Securities Law Professors 14–15 (arguing that the "ethical and social policy implications" of "[s]elling products that endanger public safety, Wal-Mart's reputation, and [its] core values," are "easily on par with employment discrimination, which the SEC's 1998 Release deemed a sufficiently significant policy issue to warrant inclusion of shareholder proposals relating to it").

48

Wal-Mart, on the other hand, contends that neither the Commission nor its staff has ever countenanced "such a broad and nebulous concept of significant policy issue." Reply Br. 21. We disagree. True enough, the Commission has adopted what can only be described as a "we-know-it-when-we-see-it" approach, *see* Palmiter at 910 (describing the Commission's "shifting approach to social/political proposals" as the "most dramatic and prominent example of SEC inconstancy" under Rule 14a-8). Yet it is hard to counter that Trinity's proposal doesn't touch the bases of what are significant concerns in our society and corporations in that society. Thus we deem that its proposal raises a matter of sufficiently significant policy.

Our concurring colleague, Judge Shwartz, would allow Wal-Mart to exclude Trinity's proposal because it doesn't focus on the retailer's sale of guns with high-capacity magazines. As she points out, it instead focuses on the broader issue of the company's commitment to public safety through the sale of products that can be especially dangerous to the community. Concurring Op. at 6–7 ("The 'public safety' component of the proposal could cover many products, especially in light of the amount of products Wal-Mart offers, and thus might require [it] to develop policies and standards for thousands of goods."). And because this policy issue has the potential to bring "thousands" of products under its umbrella—not just guns with high-capacity magazines—it does not "as a whole 'focus'" on a significant policy issue. *Id.* at 7 (alterations omitted).

Our colleague also believes that the second and third parts of Trinity's proposal do not raise issues of significant import. She claims that Wal-Mart's management of risk to its brand value (the proposal's second part) and its reputation as a family retailer (the third part) relate to matters that, "while certainly important to shareholders seeking a return on their

49

investment," are "not of broad societal concern."  Concurring Op. at 7.  Thus, she posits, these parts of the proposal relate to policy issues the exception doesn't deem significant.  The trouble is the social-policy exception—despite its name—is not so limited.

The good news is we come to the ultimate conclusion of Judge Shwartz—that Trinity's proposal is excludable under the ordinary business bar—but take a different path.  We are more persuaded by the view that, because the proposal relates to a policy issue that targets the retailer-consumer interaction, it doesn't raise an issue that *transcends* in this instance Wal-Mart's ordinary business operations, as product selection is the foundation of retail management.

> 2. Even if Trinity's proposal raises a significant policy issue, does that issue transcend Wal-Mart's ordinary business operations?

To repeat, where "a proposal's underlying subject matter transcends the day-to-day business matters of the company *and* raises policy issues so significant that it would be appropriate for a shareholder vote, the proposal generally will not be excludable under Rule 14a-8(i)(7)."  SEC Staff Legal Bulletin No. 14E, 2009 WL 4363205, at *2 (Oct. 27, 2009) (emphasis added).  What this means is that, to shield its proposal from the ordinary business exclusion, a shareholder must do more than focus its proposal on a significant policy issue; the subject matter of its proposal must "transcend" the company's ordinary business.  *See* 1998 Adopting Release, 1998 WL 254809, at *4.  The Commission used the latter term, we believe, to refer to a policy issue that is divorced from how a company approaches the nitty-gritty of its core business.  *See* SEC Staff Legal Bulletin No. 14E, 2009 WL 4363205, at *3 (maintaining that CEO succession-planning "raises a significant policy issue regarding the governance of

50

the corporation that transcends the day-to-day business matter of managing the workforce").  Thus, and contrary to the position of our concurring colleague, we think the transcendence requirement plays a pivotal role in the social-policy exception calculus.  Without it shareholders would be free to submit "proposals dealing with ordinary business matters yet cabined in social policy concern." *Apache Corp. v. New York City Emps.' Ret. Sys.*, 621 F. Supp. 2d 444, 451 n.7 (S.D. Tex. 2008) (rejecting the argument that "whether a proposal implicates significant social policy is the dispositive inquiry").

For major retailers of myriad products, a policy issue is rarely transcendent if it treads on the meat of management's responsibility: crafting a product mix that satisfies consumer demand.  This explains why the Commission's staff, almost as a matter of course, allows retailers to exclude proposals that "concern[] the sale of particular products and services." *Rite Aid Corp.*, SEC No-Action Letter, 2015 WL 364996, at *1 (Mar. 24, 2015).  On the other hand, if a significant policy issue disengages from the core of a retailer's business (deciding whether to sell certain goods that customers want), it is more likely to transcend its daily business dealings.

To illustrate the distinction, a proposal that asks a supermarket chain to evaluate its sale of sugary sodas because of the effect on childhood obesity should be excludable because, although the proposal raises a significant social policy issue, the request is too entwined with the fundamentals of the daily activities of a supermarket running its business: deciding which food products will occupy its shelves.  So too would a proposal that, out of concern for animal welfare, aims to limit which food items a grocer sells. *Cf., e.g.*, *Amazon.com, Inc.*, SEC No-Action Letter, 2015 WL 470145, at *1 (Mar. 27, 2015) (allowing Amazon to exclude

51

proposal that asked it to "disclose to shareholders any reputational and financial risks that it may face as a result of negative public opinion pertaining to the treatment of animals used to produce products it sells" because the "proposal relates to the products and services offered for sale by the company"); *Papa John's Int'l, Inc.*, SEC No-Action Letter, 2014 WL 7406254, at \*1 (Feb. 13, 2015) (same for proposal that encouraged the pizza franchise to "expand its menu offerings to include vegan cheeses and vegan meats in order to advance animal welfare, reduce its ecological footprint, expand its healthier options and meet growing demand for plant-based foods").

By contrast, a proposal raising the impropriety of a supermarket's discriminatory hiring or compensation practices generally is not excludable because, even though human resources management is a core business function, it is disengaged from the essence of a supermarket's business. *See Wal-Mart Stores, Inc.*, SEC No-Action Letter, 2004 WL 326494, at \*1 (Feb. 17, 2004) (denying no-action relief where proposal asked for a report documenting "the distribution of [] equity compensation by the recipient's race and gender and discuss[ing] recent trends in equity compensation granted to women and employees of color"). The same goes for proposals asking for information on the environmental effect of constructing stores near environmentally sensitive sites. *See, e.g.*, Jenny Staletovich, *Developer Defends Walmart in Rare Forest*, The Miami Herald (Sept. 12, 2014), *available at* http://www.miamiherald.com/news/local/environment/article 2092364.html.[13]

---

[13] Our concurring colleague says our suggested test is untenable for deciding whether a proposal fits within the social-policy exception because she believes our test requires that a proposal be "completely" divorced from a company's

With those principles in mind, we turn to Trinity's proposal. Trinity says it focuses on "*both* corporate policy and social policy"—specifically, the "transcendent policy issue of under what policies and standards and with what Board oversight Wal-Mart handles [] merchandising decisions" for products that are "especially dangerous to [the company's] reputation, brand value, or the community." Trinity Br. 44 (emphasis in original). "In an age of mass shootings, increased violence, and concerns about product safety," Trinity argues, "the [p]roposal goes to the heart of Wal-Mart's impact on and approach to social welfare as well as the risks such impact and approach may have to Wal-Mart's reputation and brand image and its community." *Id.* at 43.

But is how a retailer weighs safety in deciding which products to sell too enmeshed with its day-to-day business? We think it is in this instance. As we noted before, the essence of a retailer's business is deciding what products to put on its shelves—decisions made daily that involve a careful balancing of financial, marketing, reputational, competitive and other factors. The emphasis management places on safety to the consumer or the community is fundamental to its role in managing the company in the best interests of its shareholders and cannot, "as a practical matter, be subject to direct shareholder oversight." 1998 Adopting

---

ordinary business. Concurring Op. at 3. Nowhere do we suggest that to come within the exception a proposal must raise a policy issue that is completely unrelated to a day-to-day business matter. If that were so, then a proposal relating to a retailer's discriminatory hiring practices would be excludable, as hiring is a fundamental business decision. We agree with the Commission that such a proposal is not excludable.

53

Release, 1998 WL 254809, at *4. Although shareholders perform a valuable service by creating awareness of social issues, they are not well-positioned to opine on basic business choices made by management.

It is thus not surprising that the Corp. Fin. staff consistently allows retailers to omit proposals that address their product menu. For example, it has indicated that a proposal trying to stop a retailer from selling or promoting products that connote negative stereotypes is excludable. *See, e.g.*, *Federated Dep't Stores, Inc.*, SEC No-Action Letter, 2002 WL 975596, at *13 (Mar. 27, 2002) (allowing the retailer to omit a proposal asking for a report on its "efforts to identify and disassociate from any offensive imagery to the American Indian community in products, adverting [*sic*], endorsements, sponsorships and promotions"). It has done the same for proposals aiming to restrict a retailer's promotion of products that pose a threat to public health, *see e.g.*, *Wal-Mart Stores, Inc.*, SEC No-Action Letter, 2002 WL 833445, at *1 (Apr. 1, 2002) (agreeing with Wal-Mart that it could exclude a proposal asking it to explain "its rationale for not adopting in developing nations the same policies restricting the promotion and marketing of tobacco products as in the United States"); *Walgreen Co.*, SEC No-Action Letter, 2006 WL 5381376, at *1–2 (Oct. 13, 2006) (same for proposal asking for a report regarding "the extent to which the company's private label cosmetics and personal care product lines contain carcinogens, mutagens, reproductive toxicants, and chemicals that affect the endocrine system"), as well as those proposals targeting a retailer's approach to product safety. *See, e.g.*, *Wal-Mart Stores, Inc.*, SEC No-Action Letter, 2008 WL 670182, at *1 (Mar. 11, 2008) (Wal-Mart may exclude a proposal requesting a "report on the company's policies on nanomaterial product safety"); *The Home Depot, Inc.*, SEC No-Action Letter, 2008 WL 257300, at *2 (allowing company to exclude a proposal encouraging it

"to end its sale of glue traps because they are cruel and inhumane to the target animals and pose a danger to companion animals and wildlife"); *The Home Depot, Inc.*, SEC No-Action Letter, 2008 WL 257307, at *7 (same for proposal asking for an "evaluation of company policies and practices relating to product safety").

For further support of the view that a policy issue does not transcend a company's ordinary business operations where it targets day-to-day decision-making, we look to the difference in treatment of stop-selling proposals sent to retailers and those sent to pure-play manufacturers. A policy matter relating to a product is far more likely to transcend a company's ordinary business operations when the product is that of a manufacturer with a narrow line. Here the staff often will decline a no-action request. *See, e.g.*, *Phillip Morris Companies, Inc.*, SEC No-Action Letter, 1990 WL 286063, at *1 (Feb. 22, 1990) (denying no-action relief as to proposal that requests the Board to amend the company's charter to provide that it "shall not conduct any business in tobacco or tobacco products"); *Sturm, Ruger & Co., Inc.*, SEC No-Action Letter, 2001 WL 258493, at *1 (Mar. 5, 2001) (same where proposal asks the Board to provide a report on company policies and procedures focused on reducing gun violence in the United States).

But the outcome changes where those same policy proposals are directed at retailers who sell thousands of products. *See Wal-Mart Stores, Inc.*, SEC No-Action Letter, 2001 WL 253625, at *6 (Mar. 9, 2001) (allowing Wal-Mart to exclude a proposal aimed at stopping its sale of handguns and accompanying ammunition[] in any way (e.g. by special order)" because it relates to "Wal-Mart's ordinary business operations (i.e., the sale of a particular product)"); *see also Rite Aid Corp.*, SEC No-Action Letter, 2009 WL 829472, at *1 (Mar. 26, 2009) (same for proposal asking for a report on

the company's response "to rising regulatory, competitive and public pressures to halt sales of tobacco products"); *Walgreen Co.*, SEC No-Action Letter, 1997 WL 599903, at *1 (Sept. 29, 1997) (same for proposal requesting that Walgreen stop the sale of tobacco in its stores, as it "is directed at matters relating to the conduct of the Company's ordinary business operations (i.e., the sale of a particular product)").

The reason for the difference, in our view, is that a manufacturer with a very narrow product focus—like a tobacco or gun manufacturer—exists principally to sell the product it manufactures. Its daily business deliberations do not involve whether to continue to sell the product to which it owes its reason for being. As such, a stop-selling proposal generally isn't excludable because it relates to the seller's very existence. Quite the contrary for retailers. They typically deal with thousands of products amid many options for each, precisely the sort of business decisions a retailer makes many times daily. Thus, and in contrast to the manufacturing context, a stop-selling proposal implicates a retailer's ordinary business operations and is in turn excludable. Although Trinity's proposal is not strictly a stop-selling proposal, it still targets the same basic business decision: how to weigh safety risks in the merchandising calculus.[14]

---

[14] We recognize that in "extrapolat[ing] an interpretive rationale from a [line of] [] no-action letter[s], [we] risk[] setting a legal precedent based on a rationale that the SEC never in fact advocated." Nagy at 1006. Fortunately, our word is not the last. If our interpretation is flawed, the Commission can issue new (binding) interpretative guidance to correct us. *Cf. Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 502 (3d Cir. 2008) (explaining that a court of appeals is not free to ignore the SEC's interpretation of one of its

Trinity's claim that its proposal raises a "significant" and "transcendent" *corporate* policy is likewise insufficient to fit that proposal within the social-policy exception to exclusion. *See* Trinity Br. 47. The relevant question to us is whether Wal-Mart's consideration of the risk that certain products pose to its "economic success" and "reputation for good corporate citizenship" is enmeshed with the way it runs its business and the retailer-consumer interaction. We think the answer is yes. Decisions relating to what products Wal-Mart sells in its rural locations versus its urban sites will vary considerably, and these are quintessentially calls made by management. Wal-Mart serves different Americas with different values. Its customers in rural America want different products than its customers in cities, and that management decides how to deal with these differing desires is not an issue typical for its Board of Directors. Indeed, catering to "small-town America" is how Wal-Mart built its business. *See* Sam Walton, SAM WALTON: MADE IN AMERICA 50 (1993) ("It turned out that the first big lesson we learned was that there was much, much more business out there in small-town America than anybody, including me, had ever dreamed of."). And whether to put emphasis on brand integrity and brand protection, or none at all, is naturally a decision shareholders as well as directors entrust management to make in the exercise of their experience and business judgment.

We also agree with Wal-Mart's contention (and seemingly the position of the Corp. Fin. staff) that a company

---

ambiguous rules even where the court of appeals had previously interpreted the rule and its interpretation is at odds with that of the Commission) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 976 (2005)).

can omit a shareholder proposal concerning its reputation or brand when what the proposal seeks is woven with the way the company conducts its business. *Cf. FedEx Corp.*, SEC No-Action Letter, 2014 WL 2358714, at *1 (July 11, 2014) (allowing FedEx to omit a proposal that asked for a report addressing how the company "can better respond to reputational damage from its association with the Washington D.C. NFL franchise team name controversy" because it "relates to the manner in which FedEx advertises its products and services"); *see also Equity Lifestyle Props., Inc.*, SEC No-Action Letter, 2012 WL 6723114, at *1 (Feb. 6, 2013) (same for proposal asking the Board to prepare a report on, among other things, "the reputational risks associated with the setting of unfair, inequitable and excessive rent increases that cause undue hardship to older homeowners on fixed incomes," as "the setting of prices for products and services is fundamental to management's ability to run a company on a day-to-day basis"); *Bank of America Corp.*, SEC No-Action Letter, 2010 WL 4922465, at *1 (Feb. 24, 2010) (same for proposal asking Bank of America's Board to publish a report describing the bank's policy regarding the "funding of companies engaged predominantly in mountain top removal coal mining and an assessment of the policy's efficacy in reducing [greenhouse gas] emissions and in protecting [its] reputation," as it "addresses matters beyond the environmental impact of [its] project finance decisions, such as [its] decisions to extend credit or provide other financial services to particular types of customers"); *Dean Foods Co.*, SEC No-Action Letter, 2007 WL 754960, at *1 (Mar. 9, 2007) (same for proposal requesting that an independent committee of the Board "review the company's policies and procedures for its organic dairy products and report to shareholders on the adequacy of the policies and procedures to protect the company's brands and reputation and address consumer and media criticism," because this concerns the

company's "ordinary business operations (i.e., customer relations and decisions relating to supplier relationships)").

We thus hold that, even if Trinity's proposal raises sufficiently significant social and corporate policy issues, those policies do not transcend the ordinary business operations of Wal-Mart. For a policy issue here to transcend Wal-Mart's business operations, it must target something more than the choosing of one among tens of thousands of products it sells. Trinity's proposal fails that test and is properly excludable under Rule 14a-8(i)(7).

## V.    CONCLUSION

Although a core business of courts is to interpret statutes and rules, our job is made difficult where agencies, after notice and comment, have hard-to-define exclusions to their rules and exceptions to those exclusions. For those who labor with the ordinary business exclusion and a social-policy exception that requires not only significance but "transcendence," we empathize. Despite the substantial uptick in proposals attempting to raise social policy issues that bat down the business operations bar, the SEC's last word on the subject came in the 1990s, and we have no hint that any change from it or Congress is forthcoming. As one former SEC commissioner has opined, "it is neither fair nor reasonable to expect securities experts [like the Commission and its staff] to deduce the prevailing wind on public policy issues that have yet to be addressed by Congress in any decisive fashion." *Commissioner Criticizes Subjectivity, Inconsistency in SEC Review of Proposals*, BNA Corp. Couns. Wkly., 2-3 (Mar. 31, 1993) (quoting remarks of Comm. Richard Y. Roberts). That remains true today.

We have no doubt that the Commission is equipped to collect "relevant data and views regarding the best direction

59

for its regulatory policy." Nagy at 993. We thus suggest that it consider revising its regulation of proxy contests and issue fresh interpretive guidance. In the meantime, we hold here that Trinity's proposal is excludable from Wal-Mart's proxy materials under Rule 14a-8(i)(7).

SHWARTZ, <u>Circuit Judge</u>, with whom Judge VANASKIE joins as to Part III, concurring in the judgment.

I agree with the Majority that Wal-Mart may omit Trinity's proposal from the company's proxy materials. I write separately, however, for two reasons. First, while I agree with my colleagues that the proposal is excludable based on the ordinary business exclusion, I believe that the test that it has fashioned for determining when an exception to this exclusion applies may remove many company actions over which shareholders should have a say from shareholder oversight. Second, I write to explain that both the ordinary business and the vagueness exclusions support exclusion of the entire proposal.[1]

I

SEC Rule 14a-8 requires a public company to include a shareholder proposal "in its proxy statement . . . when [the company] holds an annual or special meeting of shareholders," 17 C.F.R. § 240.14a-8, in recognition of the fact that, "with the increased dispersion of security holdings in public companies, the proxy solicitation process rather than the shareholder's meeting itself ha[s] become the forum for shareholder suffrage," Proposed Amendments to Rule 14a-8, Exchange Act Release No. 19135, 1982 WL 600869, at *2 (Oct. 14, 1982) (the "1982 Proposing Release"). The rule thus

---

[1]Trinity declined to omit any component of the proposal, Tr. of Oral Arg. at 39-40, and thus sought approval of the proposal in its entirety. Accordingly, each component of the proposal must be nonexcludable for it to comply with SEC Rule 14a-8.

1

"affords shareholders access to management proxy solicitations," both "to sound out management views and to communicate with other shareholders on matters of major import." Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc., 821 F. Supp. 877, 882 (S.D.N.Y. 1993) (internal quotation marks, citation, and alteration omitted). Such access, however, is not unfettered. In addition to eligibility and procedural requirements, SEC Rule 14a-8 is "limited by thirteen content-based exceptions," id., two of which Wal-Mart argues apply here: Rule 14a-8(i)(7) and Rule 14a-8(i)(3).

Rule 14a-8(i)(7) allows a company to exclude proposals that "deal[] with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). The SEC has explained that the determination of whether a particular shareholder proposal implicates a company's ordinary business operations "rests on two central considerations": (1) whether the "subject matter" of the proposal involves "tasks . . . fundamental to management's ability to run a company on a day-to-day basis"; and (2) "the degree to which the proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders . . . would not be in a position to make an informed judgment." Amendments to Rules on Shareholder Proposals, Release No. 23200, 1998 WL 254809, at *4-5 (May 21, 1998) ("1998 Adopting Release").

There is an exception to this exclusion. Specifically, proposals "relating to" ordinary business operations "but focusing on sufficiently significant social policy issues . . . generally would not be considered excludable," notwithstanding their relationship to ordinary business,

2

"because the proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote." Id. at *4. The Majority would limit proposals invoking the "significant social policy exception" to only those concerning matters that are "disengaged from the essence of" a company's business, Maj. Op. at 52, and reads the 1998 Adopting Release to require a proposal that focuses on a significant social policy issue to be completely "divorced from how a company approaches the nitty-gritty of its core business," Maj. Op. at 50; see also id. ("[T]o shield its proposal from the ordinary business exclusion, a shareholder must do more than focus its proposal on a significant policy issue; the subject matter of its proposal must 'transcend' the company's ordinary business."). In my view, this reading is inconsistent with the plain text of the 1998 Adopting Release.

The 1998 Adopting Release provides that, to avoid running afoul of the ordinary business exclusion, a proposal "relating to" a company's ordinary business must "focus[] on" a "sufficiently significant social policy issue." 1998 Adopting Release, 1998 WL 254809, at *4. If it does, "it generally would not be considered excludable, because the proposal[] would transcend . . . day-to-day business matters." Id. As this passage makes clear, whether a proposal focuses on an issue of social policy that is sufficiently significant is not separate and distinct from whether the proposal transcends a company's ordinary business. Rather, a proposal is sufficiently significant "because" it transcends day-to-day business matters. Id. Thus, the SEC treats the significance and transcendence concepts as interrelated, rather than independent.

3

The 1998 Adopting Release also does not require that a proposal be "disengaged from the essence of" a company's business, Maj. Op. at 52, such that a company is insulated from any submission relating to the "crafting [of] a product mix that satisfies consumer demand," Maj. Op. at 51. Indeed, the 1998 Adopting Release expressly permits a shareholder to submit a proposal that relates directly to ordinary business matters, including "decisions on production quality and quantity, and the retention of suppliers," so long as it "focus[es] on" an issue of "sufficiently significant social policy." 1998 Adopting Release, 1998 WL 254809, at *4 (acknowledging that "[c]ertain tasks," including those related to production and suppliers, "are so fundamental to management's ability to run a company on a day-to-day basis" that they are not "subject to direct shareholder oversight," but recognizing that "proposals relating to such matters but focusing on sufficiently significant social policy issues" generally are not excludable). Thus, to "transcend" ordinary business, as that term is used in the 1998 Adopting Release, a proposal need not be divorced from ordinary business, as the Majority proposes, but instead must focus on a policy issue that in some "transcend[ent]" way trumps ordinary business in importance. See id.; see also Adoption of Amendments Relating to Proposals by Security Holders, Release No. 12999, 1976 WL 160347, at *11 (Nov. 22, 1976) (noting that proposals including "certain matters which have significant policy, economic, or other implications," like "the economic and safety considerations attendant to nu[cl]ear power plants," are "of such magnitude" that they should be "considered beyond the realm of an issuer's ordinary business operations," despite their relationship to such operations).

4

In addition to conflicting with SEC guidance, the Majority's test for the "significant social policy exception" to the ordinary business exclusion is inconsistent with the purpose of § 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act"), and Rule 14a-8. When Congress enacted the Exchange Act, it sought to ensure "fair corporate suffrage." J.I. Case Co. v. Borak, 377 U.S. 426, 432 (1964). One way such suffrage is protected is through accurate proxy solicitations. Id. Congress authorized the SEC to generate rules that would advance this goal. See 15 U.S.C. § 78n. To this end, it promulgated Rule 14 to provide guidelines for shareholder proposals, including those that raise social issues. As the Commission noted in the 1998 Adopting Release, "shareholder proposals on social issues may improve investor confidence in the securities markets by providing investors with a sense that as shareholders they have a means to express their views to the management of the companies in which they invest." 1998 Adopting Release, 1998 WL 254809, at *19.

The Majority's test, insofar as it practically gives companies carte blanche to exclude any proposal raising social policy issues that are directly related to core business operations, undermines the principle of fair corporate suffrage animating Rule 14a-8: shareholders' "ability to exercise their right—some would say their duty—to control the important decisions which affect them in their capacity as . . . owners of [a] corporation." Med. Comm. for Human Rights v. SEC, 432 F.3d 659, 681-82 (D.C. Cir. 1970) (footnote omitted). Section 14(a) of the Exchange Act ensures that "[a] corporation is run for the benefit of its stockholders and not for that of its managers," SEC v. Transamerica Corp., 163 F.2d 511, 517 (3d Cir. 1947), and "Congress intended by its

5

enactment of [§] 14 . . . to give true vitality to the concept of corporate democracy," Med. Comm. for Human Rights, 432 F.3d at 676. Permitting shareholders to vote on important social issues, including those that may be closely related to a company's ordinary business, is consistent with these principles, and I would not interpret the ordinary business exclusion to prohibit it.

II

All that said, Trinity's proposal as written is excludable under the ordinary business exclusion because it lacks the focus needed to trigger the "significant social policy" exception. To qualify for this exception, Trinity's proposal must focus on a significant policy issue. Trinity's proposal asks the Board to amend the Committee charter to require that it create policies and standards for determining whether Wal-Mart should sell a product that: (1) "especially endangers public safety and well-being"; (2) "has the substantial potential to impair" Wal-Mart's reputation; and/or (3) "would reasonably be considered by many to be offensive to the family and community values integral to" Wal-Mart's brand. J.A. 268. Although the proposal states that it is for "determining whether or not [Wal-Mart] should sell guns equipped with magazines holding more than ten rounds of ammunition . . . and [for] balancing the benefits of selling such guns against the risk that these sales pose to the public and to [Wal-Mart's] reputation and brand value," J.A. 268, the full text shows that it is not directed solely to Wal-Mart's sale of guns.

The proposal has three separate components. The "public safety" component of the proposal could cover many

6

products, especially in light of the amount of products Wal-Mart offers, and thus might require Wal-Mart to develop policies and standards for thousands of goods. While Wal-Mart's sale of guns with high-capacity magazines may raise a significant social policy issue concerning public safety, not all products that may fall within the proposal do so. Thus, while the first component of Trinity's proposal may raise a significant issue of social policy, insofar as it touches on the sale of guns equipped with high capacity magazines, we cannot say that the proposal as a whole "focus[es] on" such an issue. 1998 Adopting Release, 1998 WL 254809, at *4. Accordingly, Trinity may not avail itself of the "significant social policy exception" to the ordinary business exclusion.

Similarly, the second and third components of the proposal could cover many products. They are also problematic for other reasons. The second component seeks standards for determining whether Wal-Mart should sell a product that may impair the company's reputation. How Wal-Mart would like others to view it is a unique company interest, and while certainly important to shareholders seeking a return on their investment, it is not of broad societal concern. The third component, which asks the Board to consider whether the sale of a product would impact its brand, also focuses on matters of interest to the company but not society at large. Thus, these components cover matters relating to Wal-Mart's ordinary business operations, do not present a social policy issue, and render the entire proposal excludable.

III

7

There is an additional problem with the third component of the proposal: it is vague and thus excludable under Rule 14a-8(i)(3). Rule 14a-8(i)(3) permits a company to exclude shareholder proposals that are "so vague and ambiguous that the issuer and security holders would not be able to determine what action the proposal is contemplating," 1982 Proposing Release, 1982 WL 600869, at *13. The rationale for excluding a shareholder proposal that is "vague and ambiguous" is twofold: (1) shareholders are entitled to know the breadth of the proposal on which they are asked to vote; and (2) the company must be able to comprehend what actions or measures the proposal requires of it. See Dyer v. SEC, 287 F.2d 773, 781 (8th Cir. 1961); N.Y.C. Emps. Ret. Sys. v. Brunswick, 789 F. Supp. 144, 146 (S.D.N.Y. 1992).

As previously stated, the third component of the proposal that asks the Committee to formulate policies and standards for the sale of products that "would reasonably be considered by many to be offensive to the family and community values integral to" Wal-Mart's brand. J.A. 268. While Trinity argues that this component simply asks the Committee to consider whether a product may negatively impact its brand, the proposal, as written, measures that impact based upon what "many" view as "offensive" to "family and community values." Trinity attempts to link these terms back to what Wal-Mart has said about its values, including the "Save Money, Live Better" tag line, but these buzz words fail to provide any concrete guidance as to what constitutes "many" or what "family values" should be considered. Thus, this component of the proposal does not inform the shareholders of the breadth of the subject on which they would be asked to vote nor does it make clear what the Company would be required to do if it were adopted. For this

8

reason, the proposal is also excludable under Rule 14a-8(i)(3).

IV

I therefore concur in the judgment.

9